UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

　　　　- against -

JAMES JEREMY BARBERA,

　　　　　　　　　Defendant.

21 Cr. 154 (JGK)

MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

On February 17, 2022, following a jury trial, the
defendant, James Jeremy Barbera, was found guilty of conspiracy
in violation of 18 U.S.C. § 371 to commit the substantive
offenses of securities fraud and wire fraud. He was also found
guilty of committing the substantive crimes of securities fraud
and wire fraud. The charges in the three-count indictment arose
out of the defendant's participation in a scheme to defraud
dozens of investors in Nanobeak Biotech Inc. ("Nanobeak") out of
approximately $12.2 million by soliciting investments through
false and misleading statements, by failing to use investors'
funds as promised, and by converting investors' money to his own
use, from in or about 2013 through in or about 2020. The
defendant has brought a motion for a new trial pursuant to
Federal Rule of Criminal Procedure 33.

The defendant argues that there are five reasons that,
independently and in combination, warrant a new trial. First,
the defendant argues that his post-arrest statements should not

have been admitted into evidence at trial. Second, the defendant argues that the "gratuitous and intentionally inflammatory testimony" of Joseph Peters prejudiced the defendant's right to a fair trial. ECF No. 128, at 1. Third, the defendant argues that the Government deliberately elicited testimony that was prejudicial to the defendant and that the Government knew to be the product of faulty recollection, and that the Government structured certain questions to elicit truthful testimony that conveyed misleading and prejudicial information to the jury. Fourth, the defendant argues that the evidence adduced at trial did not support a conscious avoidance jury instruction. Fifth, the defendant argues that his tax returns should not have been admitted into evidence.

For the reasons explained below, each of the defendant's arguments lacks merit, and the motion for a new trial is **denied**.

## I.

Federal Rule of Criminal Procedure 33(a) provides that the court may grant a defendant's motion for a new trial "if the interest of justice so requires." "Rule 33 motions are granted only in extraordinary circumstances, and are committed to the trial court's discretion." United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009).[1] "The defendant bears the burden of

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." Id. "[T]rial courts must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992). "The test is whether it would be a manifest injustice to let the guilty verdict stand." Id.

## II.

A motion for a new trial should not be granted if the court is "satisfied that competent, satisfactory and sufficient evidence in [the] record supports the jury's finding that [the] defendant is guilty beyond a reasonable doubt." Id.

In this case, the record is clear that the defendant, the chief executive officer of Nanobeak, made material misrepresentations to investors to induce their investments in Nanobeak. For example, the defendant misrepresented his credentials to investors by falsely claiming that he was a physicist, that he had a master's degree, and that he worked as a scientist at the National Aeronautics and Space Administration ("NASA"). See, e.g., Gov't Exs. 300-18, 801, 805, 900; Def't Ex. 218; Trial Tr. 49, 173-74, 181-82, 432, 608, 612, 635, 657. None of this was true. At least one investor stated that the defendant's false statements about his academic and professional

background were material to the investor's decision to invest in
Nanobeak. See id. at 182-83.

The defendant also misrepresented to investors that
Nanobeak had a working breathalyzer device that could detect
early stage lung cancer or drugs and that the device was ready
for sale or being tested in clinical trials. See, e.g., Gov't
Exs. 404A, 405, 601-02; Trial Tr. 50-51, 76, 105, 108-11, 264-
65, 610, 614, 635, 679. In reality, Nanobeak never had a device
that could detect cancer or drugs and the Nanobeak breathalyzer
was never tested in any clinical trial. Moreover, the defendant
privately acknowledged that his representations to investors
about the state of the Nanobeak device were misleading: for
example, the defendant told NASA in 2016 that sales were not
expected until 2019, even though he told an investor in 2016
that Nanobeak expected millions of dollars in revenue from sales
of sensors in 2017. Gov't Exs. 205, 601-02. The defendant also
acknowledged to Nanobeak's chief scientist in November 2017 that
Nanobeak lacked "the hard data to support our confidence in the
sensor[']s capabilities." Gov't Ex. 398; Trial Tr. 330-31.
Several investors testified that the defendant's false
representations about the status of Nanobeak's device were
material to their investment decisions. See, e.g., id. at 101,
115-17, 609, 614-15, 636-37, 681.

4

The defendant also misled investors by indicating that an initial public offering ("IPO") of Nanobeak stock was imminent. See, e.g., Gov't Exs. 404A, 691; Trial Tr. 64-65, 73, 97, 188, 192, 636, 640-41, 679-80. The defendant specifically told at least one investor that the defendant would remain as CEO of Nanobeak after the company's IPO. Id. at 640-41. In fact, the defendant was barred from serving as an officer or director of a public company as a result of a settlement he entered into with the Securities and Exchange Commission ("SEC") in 2014 (the "SEC Ban"). Gov't Exs. 802, 903. At least one investor testified that the prospect of an imminent IPO was material to his investment decision. See, e.g., Trial Tr. 65, 73. Investors also testified that they would not have invested in Nanobeak if they had known about the SEC Ban. Id. at 80, 641.

The defendant also misrepresented to investors that their investments would be spent on legitimate business expenses such as research and development. See, e.g., Gov't Exs. 401, at 9:23, 609, at 5 of 10; Trial Tr. 69-70, 186-87, 644, 674, 681. In fact, the defendant used a significant portion of investor money for personal purposes, including housing, caring for the defendant's family members, school tuition for the defendant's children, and jewelry. See, e.g., Gov't Exs. 1001-12; Trial Tr. 801-07. Between January 2016 and April 2020, the defendant spent $3,297,647 from Nanobeak accounts on personal expenses. Id. at

807. And although the defendant argued at trial that he was
entitled to take money from the Nanobeak accounts as
compensation, the defendant misrepresented to investors and the
Nanobeak board of directors how much money he received from
Nanobeak, see Gov't Exs. 310, 317-18, and reported on his tax
returns only a small fraction of the Nanobeak money he received,
see Gov't Exs. 500-07, 800. Several investors testified that
they would not have invested in Nanobeak if they had known that
the defendant would use their investments to pay personal
expenses. See, e.g., Trial Tr. 100-01, 186-87, 644, 674.

With respect to the conspiracy charge, the evidence
established that the defendant and Carl Smith worked together to
recruit investors and use investments for personal gain. See,
e.g., Gov't Exs. 327, 346, 635, 641, 1010-12. Carl Smith made
misrepresentations to investors that were similar to the
misrepresentations made by the defendant. See, e.g., Trial Tr.
276-77, 293-94.

The foregoing is not an exhaustive summary of the evidence
of the defendant's guilt, but it is sufficient to demonstrate
that the Government offered competent evidence at trial that was
more than sufficient to support the jury's guilty verdict on all
three counts of the indictment. The defendant's motion for a new
trial fails on this basis alone. See McCourty, 562 F.3d at 475;

Sanchez, 969 F.2d at 1414. The defendant's specific arguments are also without merit.

### III.

### A.

The defendant argues that his post-arrest statements should not have been admitted into evidence at trial. This argument, like several others raised in the defendant's motion, attempts to relitigate an evidentiary ruling that the Court made before or during trial. But "a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions." United States v. Soto, No. 12-cr-556, 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014), aff'd sub nom. United States v. Ramos, 622 F. App'x 29 (2d Cir. 2015). In any event, the defendant's argument is without merit.

The post-arrest statements at issue were made by the defendant in the presence of two of the arresting agents during the car ride from the defendant's apartment to the hospital. The defendant was transported to the hospital because the defendant stated that he was sick and suffering from COVID-19. Federal Bureau of Investigation Special Agent ("SA") Kristin Allain was driving the car, and SA Jonathan Polonitza was sitting in the back seat with the defendant. 11/4/21 Tr., ECF No. 59, at 19. During the ride from the defendant's apartment to the hospital, the defendant stated, among other things, that he exaggerated to

7

investors and that he was sloppy with company money, including
by using investor funds for personal expenses. See id. at 82;
Trial Tr. 779-80.

The defendant moved to suppress his post-arrest statements
before trial. The Court held an evidentiary hearing on November
4, 2021 to determine whether the defendant was advised of his
rights under Miranda v. Arizona, 384 U.S. 436 (1966), and
whether he knowingly and voluntarily waived those rights. SA
Polonitza, who was called by the Government, was the only
witness at the evidentiary hearing. The Court denied the
defendant's motion to suppress on the record at a conference
held on December 16, 2021.[2] The Court found that SA Polonitza
testified credibly at the evidentiary hearing and that the
defendant's statements were made knowingly and voluntarily after
he had been given Miranda warnings. See 12/16/21 Tr., ECF No.
82, at 12-14; Berghuis v. Thompkins, 560 U.S. 370, 384 (2010)
("Where the prosecution shows that a Miranda warning was given
and that it was understood by the accused, an accused's
uncoerced statement establishes an implied waiver of the right

---

[2] Although the defendant initially argued that his post-arrest statements were
obtained in violation of Miranda and that his statements were involuntary and
elicited in violation of his right to due process, the defendant narrowed his
motion after the evidentiary hearing and argued only that his post-arrest
statements were elicited in violation of Miranda because he did not knowingly
and voluntarily waive his Miranda right not to make a statement after
receiving the Miranda warnings.

to remain silent."). There was no evidence in this case of police misconduct or coercion.

The defendant points to a discrepancy between SA Allain's trial testimony and SA Polonitza's testimony at the evidentiary hearing. SA Polonitza testified that the defendant started the conversation in the car about the substance of the defendant's conduct. See 11/4/21 Tr. 27. At trial, however, SA Allain testified that the "interview" of the defendant in the car began with SA Polonitza's "essentially telling Mr. Barbera what [SA Polonitza] had uncovered throughout the course of his investigation." Trial Tr. 773.[3] Because of this discrepancy in the agents' testimony, the defendant argues that SA Polonitza's testimony can no longer be considered credible. In addition to arguing that the post-arrest statements should not have been admitted at trial, the defendant seeks leave to reopen the suppression hearing.

The defendant's argument fails because the inconsistency in the agents' testimony has no bearing on whether the defendant's post-arrest statements were elicited in violation of Miranda. At the December 16, 2021 conference, the Court concluded that the Government had met its burden of proving that the defendant was

---

[3] The issue arose at trial because, when SA Allain was describing what SA Polonitza said to the defendant in the car, the defendant objected to SA Allain's recitation of the evidence against the defendant. The Court struck that recitation as hearsay. See Trial Tr. 773-77.

advised of his Miranda rights before he made the post-arrest
statements and that the defendant knowingly and voluntarily
waived his Miranda rights. 12/16/21 Tr. 12-14.[4] Nothing in SA
Allain's testimony casts doubt on those findings. To the
contrary, SA Allain testified that the defendant was advised of
his Miranda rights before making the statements at issue. Trial
Tr. 772, 830-31. This testimony was consistent with SA
Polonitza's testimony and SA Polonitza's contemporaneous notes.
12/16/21 Tr. 9, 12. The only discrepancy between the agents'
testimony - whether the defendant or SA Polonitza started the
interview - does not affect the admissibility of the post-arrest
statements and does not render the rest of SA Polonitza's
testimony incredible. Nothing in SA Allain's testimony affects
the Court's finding that the post-arrest statements were
knowingly and voluntarily made after the Miranda warnings were
given.

Accordingly, the Court would have admitted the defendant's
post-arrest statements even if SA Allain had testified at the
evidentiary hearing consistently with her trial testimony.
Although the court may reopen a suppression hearing when "new
evidence has come to light that seriously undermines or calls

---

[4] The record also reflects that the arresting agents were respectful to the
defendant: the defendant's attorney at the time of his arrest expressed
appreciation to SA Polonitza for the respect SA Polonitza had shown to the
defendant and subsequently conveyed the defendant's personal thanks to SA
Polonitza. 11/4/21 Tr. 50-51.

into question the court's original . . . determination," United States v. Campbell, No. 20-4036, 2022 WL 697565, at *1 (2d Cir. Mar. 9, 2022), SA Allain's testimony does not undermine the Court's decision to admit the defendant's post-arrest statements. SA Allain's testimony does not affect the Court's conclusion based on all the evidence at the suppression hearing that SA Polonitza testified credibly that the defendant knowingly and voluntarily waived his right to remain silent after the defendant received his Miranda warnings. Therefore the Court will not reopen the suppression hearing and the admission of the defendant's post-arrest statements does not warrant a new trial.

**B.**

The defendant next argues that several statements by Joseph Peters, a Government witness, were so gratuitous and inappropriate as to warrant a new trial.

First, the defendant points to a single reference by Mr. Peters to Theranos, the company founded by Elizabeth Holmes, who was convicted of fraud prior to the defendant's trial. When asked by defense counsel on cross-examination if he was familiar with a company called "Theranosti[cs]," Mr. Peters responded: "Was that Theranos, the Elizabeth Holmes company?" Trial Tr. 580. The Court promptly granted the defendant's motion to strike

Mr. Peters' response. Id. at 581.[5] The defendant says that Mr. Peters' one-off reference to Theranos was part of a "calculated effort to ensure Mr. Barbera's conviction." ECF No. 128, at 5. But Mr. Peters' response was reasonable in view of the similar names of the companies and, as the Court noted to counsel outside the presence of the jury, Mr. Peters appeared surprised at defense counsel's question. Trial Tr. 702. Moreover, courts "normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating to the defendant." Greer v. Miller, 483 U.S. 756, 766 n.8 (1987). Here, the Court immediately struck Mr. Peters' response, and the Court instructed the jury at the beginning of trial to disregard any stricken testimony. See Trial Tr. 11. It is inconceivable that the jury was incapable of disregarding this one-off refence to Theranos — a company that was not mentioned again throughout the defendant's trial and whose name came up in response to a question by defense counsel about a company with a similar name. Accordingly, this comment by Mr. Peters does not warrant a new trial.

---

[5] The trial transcript mistakenly attributes the motion to strike to the Government. See Trial Tr. 580.

The defendant objects to various other comments by Mr.
Peters but, when there were objections, the Court sustained
them, and the defendant does not point to any testimony as to
which there was an objection that the Court did not strike.[6] With
respect to testimony as to which there was no objection, this
testimony often related to evidence that was properly in the
record. There is no reasonable argument that such evidence could
have improperly affected the jury. At the end of the day, the
defendant has failed to point to any testimony as to which there

---

[6] For example, the defendant objects to two instances in which Mr. Peters
referred to a forensic audit that was commissioned by Nanobeak's board of
directors. The Court sustained the defendant's objection and struck one of
these comments, Trial Tr. 495, and the other comment was not objected to, id.
at 596. In any event, neither comment could have improperly influenced the
jury because evidence of the forensic audit was properly in the record
without objection. See, e.g., id. at 208-10. The defendant also objects that
Mr. Peters, a lawyer, "used terminology that he knew would likely be included
in the Court's instructions to the jury on materiality." ECF No. 128, at 5;
see Trial Tr. 467-68 ("[Investors] had a right to know [about the SEC Ban] up
front and it should be the first thing they heard about and we shouldn't
discuss anything further until they were aware of it because I thought it
material to their decision to invest or not."). The defendant did not object
to this testimony. Moreover, as the Court noted the next day outside the
presence of the jury when defense counsel referenced this comment, the Court
"didn't take the witness as testifying to a legal conclusion as opposed to a
lay person's ability to testify about whether something made a difference to
them in terms of their decision to invest, which a lay witness is permitted
to do." Id. at 701. The Court also noted that, if there had been an
objection, the Court may well have sustained it, but that would only have led
to Mr. Peters' testifying in another way about the same thing. Id.
Accordingly, this testimony was proper and did not prejudice the defendant.
At trial, defense counsel appeared to agree and conceded that Mr. Peters'
comment "didn't register to me as any sort of objectionable, the way he said
it." Id. at 701-02. Finally, the defendant objects to several references by
Mr. Peters to the SEC Ban and settlement that were allegedly non-responsive.
These comments were not objected to and they could not have improperly
impacted the jury because evidence of the SEC settlement was properly in the
record because it prevented the defendant from becoming an officer of a
public company and showed the falsity of some of his representations.

was an objection that the Court did not sustain and that
conceivably could have had an improper impact on the jury.[7]

### C.

The defendant argues next that the Government elicited
testimony in ways that misled the jury. But the defendant
clarifies that he "do[es] not contend that the prosecutors
engaged in deliberate misconduct warranting a new trial" and
"do[es] not suggest that the government knowingly elicited
perjurious testimony or deliberately made improper remarks to
the jury." ECF No. 128, at 10. Having abandoned potential bases
for a new trial, the defendant objects to the impression left by
certain testimony. None of this testimony provides a basis for a
new trial.

The defendant objects to testimony elicited by the
Government from Mr. Peters concerning the results of a clinical
trial at Johns Hopkins University that was designed to detect a
breath signature for stage 1 lung cancer. The Government asked
Mr. Peters whether, during his time at Nanobeak, he "ever
receive[d] a report or information about the progress or results
of the clinical trial." Trial Tr. 479. Mr. Peters answered that

---

[7] The defendant argues that the fact that the jury never requested any
transcripts or exhibits during deliberations supports the defendant's
"theory" that Mr. Peters' improper testimony inflicted "cumulative damage" on
the defendant. ECF No. 128, at 9. This argument is entirely speculative.
Moreover, the defendant fails to account for a simpler, more reasonable
explanation for why the jury did not request transcripts or exhibits during
deliberations: the evidence of the defendant's guilt was overwhelming.

the "only report that I saw was at the conclusion of the trial," which he stated was in February 2019. Id. at 479-80. Mr. Peters testified that the defendant stated that the signature identified in the clinical trial was "not as accurate as we had hoped; that John[]s Hopkins had terminated the trial early. When I asked why, I recall [the defendant] saying that continuing the trial to the end would not have materially affected the ultimate results and also something to the effect that they never had a sufficient number of people in the trial anyway." Id. at 482. Mr. Peters testified that he understood these results to mean that Nanobeak "would have trouble getting through the [Food and Drug Administration] to be able to produce and market and sell [the Nanobeak] device because its accuracy wasn't sufficiently high." Id. at 483.

The defendant argues that the Government knew the Johns Hopkins clinical trial in fact ended in July 2019, not February 2019, and that the Government "sought, through Mr. Peters' mistaken recollection, to establish that the clinical trials were a failure, and that as a result, Johns Hopkins terminated the trial early." ECF No. 128, at 11. This argument fails for several reasons. First, the defendant did not object at trial to this testimony. Second, the defendant was free to cross-examine Mr. Peters about any inaccuracy in his recollection of the end date of the clinical trial, and the defendant did in fact do so,

see Trial Tr. 540-41.[8] Finally, the issue of whether the Johns
Hopkins clinical trial ended in February 2019 or July 2019 is
not material to the defendant's guilt. While the Johns Hopkins
trial was designed for the preliminary purpose of detecting a
breath signature for stage 1 lung cancer, the evidence shows
that the defendant misrepresented to investors that the Nanobeak
device was itself being tested in clinical trials, including
trials at Johns Hopkins. See, e.g., id. at 50-51, 101, 108-11,
610, 637. Because the Johns Hopkins clinical trial never
involved the actual Nanobeak device, it is plain that the
defendant made misrepresentations to investors about the Johns
Hopkins trial, regardless of when that trial ended and
regardless of whether it was a "failure."[9]

The defendant also objects to two portions of testimony
from Tom Joyce. First, the defendant objects to testimony from
Mr. Joyce that suggested Johns Hopkins terminated the clinical
trial because Nanobeak owed Johns Hopkins money: "Q: You

---

[8] The defendant also introduced evidence indicating that the clinical trial
extended beyond February 2019 and that the results were, in some people's
view, "a little better than we expected." Def't Ex. 705. This evidence was
admitted for the limited purpose of its effect on the defendant. Trial Tr.
884.

[9] The defendant disputes that the Johns Hopkins trial was terminated due to
disappointing results, but the defendant does not point to any evidence
suggesting that the trial was ultimately a success. It is undisputed that
Nanobeak was never able to produce a device that could detect lung cancer
using a breath signature, and the defendant does not point to any evidence
that the Johns Hopkins trial ever produced a breath signature more accurate
than the "50 percent-plus range" that Mr. Peters testified to, Trial Tr. 482,
540. Moreover, according to Mr. Peters, the defendant stated that continuing
the trial "would not have materially affected the ultimate results." Id. at
482.

mentioned that the [Johns Hopkins] study had been suspended at the time you became CEO, did Nanobeak owe Johns Hopkins any money? A: Yes, about $75,000." Id. at 204. The defendant did not object at trial to this testimony. Without citing any evidence, the defendant argues in his motion that the Johns Hopkins trial was in fact terminated because, unbeknownst to the defendant, Johns Hopkins was served with a grand jury subpoena. ECF No. 128, at 11-12. But Mr. Joyce testified to his understanding of why the Johns Hopkins trial was terminated, and his testimony on cross-examination clarified – and was consistent with – his direct testimony:

> Q: Do you recall that the John[]s Hopkins study, clinical trial, was terminated not that long after you joined? True?
>
> A: Yes. That is true. As I recall, they made the determination -- well, two things happened, right? We heard from John[]s Hopkins that they were going to stop doing work on the project because we were $75,000 in arrears and they weren't going to do anything until we paid them. . . . But they also told us that the clinical trial was going to be suspended short of the announced goal of participants. I believe the participant total was supposed to be well in excess of 400. And I think they stopped the trial – they decided to stop the trial because they "had the data we need" with something like 300 participants.

Trial Tr. 258. Mr. Joyce also stated that a video released by Bill Clark "did not help the relationship with John[]s Hopkins." Id. Accordingly, Mr. Joyce testified that the fact that Nanobeak owed Johns Hopkins money was one of several reasons that the

clinical trial was terminated. Nothing about Mr. Joyce's direct testimony was misleading, and any dispute regarding why the clinical trial was terminated does not warrant a new trial.

The defendant next objects to Mr. Joyce's testimony that the defendant directed Mr. Joyce to submit a wire transfer of his Nanobeak investment to the "Nanobeak Ukraine" bank account. See id. at 208-09. The defendant complains that this testimony "left the impression for the jury that Mr. Barbera intentionally sought to divert Mr. Joyce's funds from Nanobeak to an account he controlled and that no one else at Nanobeak was aware of." ECF No. 128, at 14. The defendant did not object at trial to this testimony. Moreover, Mr. Joyce did not state – and the Government did not argue – that the defendant misappropriated Mr. Joyce's investment. Rather, the Government points out that it elicited testimony concerning the defendant's use of the Nanobeak Ukraine account to establish the relevance of subsequent testimony that, when the Nanobeak board requested access to records for the Nanobeak Ukraine account, the defendant refused. See Trial Tr. 209. Finally, the defendant was free to cross-examine Mr. Joyce to clarify any perceived misimpression about the defendant's use of the Nanobeak Ukraine account, and the defendant did in fact do so. See id. at 221-22.

Accordingly, none of the testimony that the defendant objects to provides a basis for a new trial.

## D.

The defendant argues that a conscious avoidance instruction should not have been given to the jury.

> The jury may be instructed on conscious avoidance only where (1) the defendant asserts the lack of some specific aspect of knowledge required for conviction, and (2) the appropriate factual predicate for the charge exists, i.e., the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.

United States v. Kozeny, 667 F.3d 122, 132 (2d Cir. 2011). The defendant does not argue that the conscious avoidance charge was inaccurate in any way. Rather, the defendant argues that there was no factual predicate for the instruction in this case. But that is not so. As the Court explained at the charge conference, the defendant received updates about various projects that should have put him on notice that some of his representations to investors were not true, and the defendant deliberately failed to determine whether his representations were true. See Trial Tr. 920. For example, the defendant acknowledged to Mr. Peters that the results of the Johns Hopkins study that were reviewed in February 2019 were disappointing. Id. at 483. But, after that time and without any more promising evidence of a viable breath signature for lung cancer, the defendant continued to misrepresent the nature and success of the Johns Hopkins trial. See, e.g., Gov't Ex. 617, at 12 of 25 (slide deck sent in

19

February 2020 stating that Nanobeak "turned NASA state-of-the-art technology into an early stage cancer and drug detection device" and "developed a preliminary biomarker signature for stage 1 lung cancer" "[a]long with Johns Hopkins").

The defendant also indicated in March 2020 that a Nanobeak IPO was planned for the first quarter of 2021 and that Nanobeak had been "in discussions with JPMorgan at length" about JPMorgan's involvement in the IPO, Gov't Ex. 404A; Trial Tr. 95, even though the head of JPMorgan's health care equity capital markets business testified that he had never discussed the prospect of a Nanobeak IPO with the defendant, that the defendant never mentioned the SEC Ban to him, and that JPMorgan had no involvement in a Nanobeak IPO, id. at 145-48.[10] Accordingly, in light of this and other evidence, the jury could have concluded that the defendant was aware of a high probability that his representations were false but deliberately avoided confirming that fact. The conscious avoidance instruction was proper.

Moreover, the defendant could not have been prejudiced by the instruction. The defendant does not dispute that the instruction was a correct statement of Second Circuit law. Thus, if the jury followed the instruction as it was required to do,

---

[10] The JPMorgan employee also testified that he had never been involved with an IPO for a company whose CEO was barred by the SEC from serving as the officer of a public company. See Trial Tr. 146-47.

the defendant could not have been prejudiced. Furthermore, in view of the substantial evidence against the defendant, including evidence of his actual knowledge of the falsity of his representations, this charge could not be the basis for a new trial. See, e.g., Gov't Exs. 205, 398, 601-02; Trial Tr. 330-31.

**E.**

Finally, the defendant argues that evidence of the defendant's tax returns should not have been admitted at trial. The defendant moved to exclude, and the Government moved to admit, this evidence before trial. The Court ruled that the Government could not introduce the tax evidence unless and until the defendant argued at trial that he was entitled to use money from the Nanobeak accounts as a form of compensation. See 1/21/22 Tr., ECF No. 91, at 8-9. At trial, the defendant argued to the jury that the defendant was entitled to use Nanobeak money for personal expenses as a form of compensation. Defense counsel explicitly confirmed that this was the defendant's argument. See Trial Tr. 723-25. Accordingly, the Court admitted the defendant's tax returns - which reported only a small fraction of the money the defendant received from Nanobeak - for the limited purpose of proving that the defendant knew he was not entitled to the Nanobeak money that he used for personal expenses. Id. at 727-28. The Court concluded that the tax evidence was not unduly prejudicial under Federal Rule of

Evidence 403. The relevance of the evidence was not substantially outweighed by any danger of unfair prejudice. The evidence was not inflammatory and was not more sensational than other evidence in the case. See id. at 727-28, 741-42. The Court instructed the jury that it could consider evidence of the tax returns only with respect to the issue of the defendant's knowledge, and not as evidence of criminal propensity or the defendant's bad character. Id. at 1083-84.

The defendant concedes that the Court's decision to admit the tax evidence was consistent with Second Circuit precedent. See United States v. Bergstein, 788 F. App'x 742, 745 (2d Cir. 2019); United States v. Valenti, 60 F.3d 941, 946 (2d Cir. 1995). But the defendant argues that the tax evidence should have been excluded under Rule 403.[11] This argument is without

---

[11] In addition to demonstrating the relevance of the defendant's tax returns, Bergstein and Valenti stand for the proposition that such evidence is not unduly prejudicial when it is offered to show knowledge with respect to a non-tax crime. See Bergstein, 788 F. App'x at 745 ("The [tax return] evidence demonstrated Bergstein's intent and absence of mistake, was relevant to his claim that his transactions were legitimate, and was not unfairly prejudicial."); Valenti, 60 F.3d at 946 ("Any arguable prejudice to Valenti was de minimis: it strains credulity to think that the jury might have believed Valenti innocent of transporting stolen goods, but voted to convict him anyway just because he failed to report income on his tax returns."). The defendant argues that Valenti is inapposite because in this case there is no dispute that the defendant was entitled to compensation as president and CEO of Nanobeak. This argument fails because any entitlement the defendant had to some income from Nanobeak does not explain the approximately $3 million of Nanobeak money that the defendant spent on personal expenses but did not declare as income. See, e.g., Gov't Ex. 502; Trial Tr. 806-07 (the defendant spent $894,861 of Nanobeak money on personal expenses in 2017 but declared $59,120 in income). The defendant also argues that there is no evidence "that a single investor ever asked Mr. Barbera as to the amount of compensation he took or the manner in which he paid himself." ECF No. 128, at 18. But this does not address the Government's argument that the defendant would have reported income that he believed was legitimate. And there was evidence that

merit. The defendant's tax returns were highly relevant to the issue of the defendant's knowledge and responsive to the defendant's argument at trial that he justifiably took investor money as compensation. That the defendant did not report the great majority of the money he took from Nanobeak on his tax returns tends to establish the defendant's knowledge that the money was not legitimate compensation. Furthermore, the tax returns were not an appeal to passion or prejudice, and the tax evidence was no more sensational than the other evidence in the case. Moreover, the tax evidence is sufficiently separate from the charges in the case so that there is no conceivable risk that the jury used it for an improper propensity purpose.

Accordingly, evidence of the defendant's tax returns was properly admitted.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the reasons explained above, the defendant's motion for a new trial is **denied.**

the defendant represented that investor money was being used for proper corporate purposes. See, e.g., Trial Tr. 69-70, 186-87, 644, 674, 681.

23

The Clerk is directed to close all pending motions.

SO ORDERED.

Dated:      New York, New York
            August 5, 2022

                                    _____
                                         John G. Koeltl
                                 United States District Judge